## STATE v. ROBINSON.

No. 7292.  Decided November 9, 1949.  (211 P. 2d 177.)

Rehearing Denied February 6, 1950.

See 23 C. J. S., Criminal Law, sec. 923.  Evidence sufficient to convict in alibi case, see note, 124 A. L. R. 471.  See, also, 20 Am. Jur. 1097.

*O. H. Matthews*, Salt Lake City, for appellant.

*Brigham E. Roberts*, District Attorney, Salt Lake City, *Clinton D. Vernon*, Attorney General, *Robert S. Richards*, Salt Lake City, for respondent.

WADE, Justice.

Defendant, Thomas Ray Robinson, was convicted of rape of a 14 year old subnormal girl.  He seeks a reversal on the ground, among others, that the evidence is not sufficient to sustain a conviction in view of his evidence of an alibi.

The girl at the time of the act was 14 years and 6 and one-half months old.  She has never learned to read or write.  She started to school at the usual age but after being transferred to a special school for backward children it was determined that she had the I.Q. of a five year old and that further teaching would be useless.  We note that although the mental capacities are referred to as that of a child of a

given age there is really little similarity between the mind of a small child and that of a subnormal adult.

On January 6, 1948, the girl passed by a number of railroad employees at the crossing at 4th West and 5th North Street, in Salt Lake City, Utah, on her way from her home between 3rd and 4th West on 4th North Street to her aunt's home near 10th West on 5th North Street. This was about 12:30 o'clock p. m. These men being acquainted with her and her condition noticed that when she got about a half block further west a green Hudson coupe, which appeared to be about a '40 model, drove from the east alongside of her and stopped and she got in the car. The car then proceeded to the west along 5th North to about 5th West Street or more than a block away from these employees where it turned north into a vacant lot and parked in some tall dry weeds. After the car had remained there for some time the employees became alarmed for the safety of the girl and notified the police.

Later the girl told that a lone man took her in the car and raped her while it was stopped in the weeds, then backed the car out and let her out of the car a short distance west on 5th North Street from where she proceeded to her aunt's home. The car was gone before the police responded to the call. The police officer contacted the employees who had made the call and then the girl's father who took him to the aunt's home. Here they picked the girl up and took her and her father home. According to the police officer, who, with her father picked the girl up at her aunt's home, before the defendant was arrested she described the man who made the attack as about 40 years old, smooth shaven, wearing black pants, a reddish shirt, a fur collared jacket and no hat. She said that the car was one with only a small seat in the back with a colored blanket on the front seat and with some sort of a flower and ball hanging from the window.

While some police cars were parked in front of the girl's home one of the railroad employees observed a green Hudson

coupe driving north on 6th West Street stop, and park near 5th North. He signaled the police who drove to this car where they found and arrested the defendant and had him drive the car back in front of the girl's home. When arrested the defendant was not told of what he was suspected, but merely that they were investigating him. They asked him where he was from noon on, and he answered that he had been out to Magna and Garfield hunting for work. The girl was expecting them to bring the man and car in front of the home and as soon as this happened and she saw him in the car through the window she said: "That's the car and that's the man," and she repeated the same statement when when she went out on the porch. But she did not go nearer than about 50 or 60 feet to him, did not speak to him then or see him out of his car in making the identification.

Defendant was arrested about 2 o'clock p. m. or shortly thereafter. From the girl's home he was taken to the police station. The girl with her mother and father also went there with the police officers and she met defendant near the elevator and on being asked she again identified the defendant as her attacker. While there she was taken out into the garage and again shown the defendant's car which she again identified as the car in which the attack occurred. In the car was a red artificial flower fastened on the ceiling above the front windshield and a round bright ball hanging from the ceiling a few inches back from the windshield and a bright colored blanket on the front seat. Upon these articles being pointed out to her she identified them as the ones that were in the car when she was attacked.

From the transcript of her testimony on the trial it is evident that this sub-normal girl is capable of receiving accurate impressions of events which she witnessed and of conveying them to others. But she is very easily led by suggestions of others and surrounding circumstances into making inaccurate statements. On cross-examination a number of statements she made were obviously inaccurate. Her mother was sitting in front of her while she was testifying

and at one time at the suggestion of defense counsel the court abmonished her mother not to coach or signal her. While her testimony has value and is admissible there is great danger that the court and jury will not always be able to accurately determine when she is giving correct impressions and when she is merely following suggestions from others and the surrounding circumstances.

The evidence is conclusive that this girl was raped in a car out in that weed patch, and the only question is one of identification of the guilty person. Five railway employees saw the car which picked her up and saw the top thereof as it stood in the weeds for about an hour while the attack was consummated. The defendant's car in which he was arrested within a half hour or slightly more after the car left the weed patch matched the car in which she was assaulted in every detail. Only the girl saw the man who perpetrated the act, and while her identification of the defendant might well have been the result of suggestions of the surrounding circumstances rather than actual recognition of him, still before the defendant was apprehended she described him as a clean shaven man of about 40, black pants, a reddish shirt and without a hat, wearing a jacket with a fur collar, and described the car as one with only a small seat in the back, a colored blanket on the front seat and a flower and ball hanging from the window. From the record it is evident that defendant and his car answer all of these details. It is hard to conceive that these details could have been suggested to her other than through her actual impressions of what she had seen. If we leave out of consideration defendant's evidence that he was not in that vicinity at the time of the attack the evidence was sufficient to sustain the conviction.

The state's witnesses, the girl's mother and the railroad employees, quite definitely fix the time when the man in the green car picked the girl up from shortly after 12:30 to 12:45 p. m. of January 6, 1948. The mother fixes this time by events which happened in the home just before the girl

left to go to her aunt's place, and the railroad employees fix it by the fact that it was just after they had eaten lunch. The police record fixes the time when the first report was made to their office at 12:59 p. m. of that day, which is just one minute before 1:00 o'clock. This call was made after the car had stood in the weeds some time and before it had left; before the police arrived on the scene the car had left the lot. The railroad employees estimated the time it remained there at an hour or slightly less, and defendant was arrested at or shortly after 2:00 o'clock of that day. So the attack must have been made between 12:30 and 1:30 p. m.

Defendant produced strong evidence that at 12:30 he was out at the Garfield Smelter and traced his whereabouts from then until about 2:00 of that day. Two witnesses, both long and trusted employees of the Garfield Smelting Plant, testified that at 12:30 on January 6, 1948, they were in the office at that plant interviewing the defendant as a prospective employee. They fix the date by the fact that interviewing prospective employees is not their work but the man who usually does that work was on the 6th of January, 1948, in Salt Lake City, and in his absence they were taking care of that job for him. They fix the time of day by the fact that they eat their lunch in the office, but that after the 12:30 whistle sounds their duties require them elsewhere; that defendant applied for work before they had left the office and that while interviewing him and checking the possibility of giving him a job the whistle blew. Neither of them was acquainted with defendant but he told them that he had worked there before and they checked the company records of past employees and found his record and that it was good, that thereupon they checked with outside foreman to see if work could be supplied but could not place him. They testified that they suggested that he go over to the Arthur plant of the Kennecott Copper about a mile and one-half away and see if he could get work there.

The personnel supervisor of the Kennecott Copper Company's Arthur Plant, a long and trusted employee, testified

that he interviewed defendant as a prospective employee at that plant on January 6, 1948, from about 12:25 to about 1:00 o'clock; that he recognized defendant as a person he had known before but did not place his name; that he asked defendant his first and last name so that he could check their records of him as a previous employee and in doing so he wrote his name down on a day pad on his desk. He then checked defendant's previous record and found it good, then contacted the foreman on the job to try to place him but they were all full. He fixed the date by later referring to the pad on which he wrote defendant's name and found that it bore the date of January 6, 1948, and he fixed the time of day by the fact that he remembered distinctly that it was after he had finished his lunch. The whistle ending the lunch period sounds at 12:00, and he had done several short errands before returning to his desk where defendant was waiting and he estimated that defendant left his office about 1:00 o'clock.

A fourth witness testified that on January 6, 1948, he met defendant where they were both applying for work, at the Chicago Bridge Steel and Iron Company plant then under construction by Olson Construction Company at about 17th South and 5th West streets and was with him there from shortly after 1:00 o'clock to about 2:00 o'clock p. m. That witness arrived at the place before defendant, that he did not know defendant before meeting him there, that they struck up a conversation in which he suggested that if they did not get work there they should try the smelters but defendant said there was no use as he had just come from there. He fixed the date by the fact that he had returned from visiting his sick father in Idaho on Monday, January 5th, and after dinner the next day he had driven out to this plant to apply for work and had arrived there about 1:00 o'clock. Defendant arrived from 15 to 20 minutes later and they both left about 2:00 o'clock.

Each of these witnesses was approached by defendant about the details of their previous meeting within 3 to 10

days thereafter while the matter was fresh in the witnesses' mind and each after checking his memory for facts and other incidents which would help him to fix the time, made a statement in writing about the incident to which he later testified. None of them had any interest in or was acquainted with the defendant. The plants at Magna and Garfield were shown to be from 20 to 40 minutes drive away from the place where this assault occurred. Defendant has made a very strong case that he was applying for work at these various places at the very time the assault occurred.

Could any reasonable mind conclude from all this evidence that the defendant's guilt was established so surely as to preclude a reasonable doubt? If so, there must be some reasonably believable explanation of the testimony of defendant's witnesses which would make the defendant's guilt possible. Since each of defendant's witnesses were shown to be responsible persons and none of them had any interest in the defendant it would be unreasonable to believe that all four of them, on his suggestion, fabricated their story or that they testified to facts which they did not honestly believe to be true.

It would also be unreasonable to believe that the railroad employees, the girl's mother and the records of the police station could all be mistaken as to the approximate time when this event occurred. This is particularly true since the car was parked in the weeds at the exact time when the call was being made at the police station and that the time of that call was recorded in the regular course of the police business, and the search for the guilty person continued until defendant was arrested. This event was fixed both as to the date and the time of day with such accuracy that it would be unreasonable to believe that there was a substantial error in either of those respects.

The same is true of the evidence of each of the four witnesses for defendant. Each of these witnesses were contacted within a few days after the occurrence of the event

to which he testified at a time when the circumstances thereof were fresh in his memory. Not only one witness but four fixed the date on which the event occurred in connection with some other event which made it natural that he should remember the event and the date and time of day thereof. In order to believe that the defendant was guilty and was also out at these plants as these witnesses claimed, the events to which his witnesses testified would have had to have happened either on a different day of the month than the date of the crime or would have had to have happened in the morning instead of the afternoon as the witnesses claimed. Defendant could not possibly have committed this crime, then have gone out to the Kennecott Copper Company's Arthur Plant and the Garfield Smelter Company Plant and interviewed these persons and then been able to get back to 6th West Street near 5th North at the time that he was arrested. That would require from 40 to 80 minutes driving there and back to say nothing of interviewing three people for a job, within less than one hour's time.

If the jury believed that the girl gave the description of the defendant and his car as the officer testified that she did before she had seen him or his car after his arrest then the evidence is almost conclusive that he made the attack in his car. There could be many green 1940 Hudson coupes, and there could be more than one which was driven by a person who answered the description she gave driving such a car, but it is hard to believe that there would be another such car and driver in that vicinity with a flower and ball hanging from the ceiling in the manner which she described. In view of the strong nature of this proof even in the face of the strong alibi of the defendant we think the jury justified in finding that the evidence established defendant's guilt beyond a reasonable doubt.

The judgment is affirmed.

PRATT, C. J., and WOLFE, LATIMER and McDONOUGH, JJ., concur.